CAVANAUGH, Judge.
The plaintiff sues the defendants for compensation under the .Workmen’s Compensation Law of the State of Louisiana, LSA-.R.S. 23:1021 et seq., for total disability on account of injuries suffered ,by him on January IS, .1948, while engaged in dislodging a limb which had been previously cut from a tree on a right of way being cut by J. B. Pugh, an independent contractor, for the other defendant, Valley Electric Membership Corporation. Plaintiff alleges that at the time of the accident and injury defendants were engaged in the business of constructing electric power lines,- cutting and felling of timbers and the clearing of rights of way for electric power lines, and in the -building and operation of such power lines in various parishes of this state; that the defendant, J. B. -Pugh, contracted the cutting and removing of timbers off portions of the right of way, and that at the time of the accident and injury on January 16, 1948, plaintiff was employed as a laborer by J. B. Pugh. . Plaintiff alleges that in his effort to dislodge the limb from the tree, it fell and struck his left shoulder and upper portion of his back, fracturing the shoulder blade, left collar bone, ribs, and injured his spine. He also alleges that he was unconscious for several hours and was taken to a physician. By amended petition, he claims that instead of the left shoulder and left collar bone being broken, it was the right.
■ The defense to the suit was a general denial.
The suit was originally filed-in the Eleventh Judicial District Court, Parish of Vernon, on January 7, 1949, and was heard and tried by one of the judges of that court. Vernon Parish was placed in the Thirtieth Judicial District created under the Constitutional Amendment of .1952, article 7, ,§ 31, Act No. 31 of 1952. It was provided under that amendment that all cases pending in the Eleventh Judicial District Court, Parish of Vernpn, would, be'transferred and dispensed of in the newly created district designated as the Thirtieth Judicial .District comprising the Parishes of Vernon and Beauregard. ■
The case was argued before the judge of the new district on April 6, 1953, was briefed-by plaintiff and defendant, and submitted to- the Court for decision. Judgment was rendered by the Court on May 8, 1953, rejecting plaintiff’s demands. From this judgment he has appealed.
- The lower court- rendered a written opinion and judgment in the Cáse, and has fully discussed and analyzed the testimony contained in -the record in support of its reasons for rejecting plaintiff’s demand. • It was satisfied that the plaintiff was suffering from, an arthritic condition, or neuritis, as testified by all of the -medical experts in the case, but found that the plaintiff had failed to prove a causal Connection between the alleged accident sustained by him on January 16, -1948, and the arthritic condition, or neuritis, with which he suffered at the time the case was tried.
*710 We- quote -approvingly from the opinion of the lower court showing the insufficiency of- the -proof offered by plaintiff to show a causal connection between the injuries suffered in the accident and the arthritis, or neuritis, which has caused his disability:
“1. In the original petition filed January 7, 1949 (the accident occurred January 16, ,1948) to which petition plaintiff made oath, in Article 6, he alleged that the limb that fell on him ‘broke (emphasis added) petitioner’s shoulder -blade, or bone, fractured his left collar bone, and ribs and injured his spine.’ In the same article he alleged that the injury was to his left shoulder and upper portion qf his back.
“After Dr. E. E. Jordan, plaintiff’s family physician, had testified on March 3, 1950, to the effect that plaintiff’s complaint was to his right shoulder, etc., plaintiff, on March 28, 1950, filed his first supplemental petition, wherein hé’ changed Article 6 of the original petition, so as to change the shoulder injured from left to right, but reiteráted his allegation that the limb ‘broke’ his shoulder blade, or bone ‘fractured’ his collar' bone, ribs knd injured his spine.' The allegations of the amended petition were made more than 14 months after the date -of the accident.
“Not only is there no word of evidence in the record to support the allegation of the ‘breaking’ of the bones, but all the X-rays taken, by his own and defendant’s physicians, failed to disclose any evidence of broken bones.
“2. Also in Article 6 of'the original petition, it is alleged that plaintiff ‘was unconscious for several hours, was carried to a physician’ (emphasis added). These alle-gationswere reiterated in his amended petition. As a matter of fact, the evidence (his testimony) shows that he was ‘blacked out’ only a short time, the accident happened about 8:30 in the morning, he worked the remainder of the day, left the job when the remainder of the crew did, from 3 to 4 o’clock that afternoon, went home, bor- . rowed a truck, which .his son drove and went to Robeline, where he saw Dr. Jordan on the side-walk and according to plaintiff, told the doctor he had been hurt, but according to the doctor, no mention was made of any accident, and the doctor advised rubbing the sore places with linament.
“3. It is evident that plaintiff continued to work on the same job after the accident and worked every day-that the crew worked until the job in Vernon Parish was finished and then went with the -crew and worked on another similar job, near Shreveport, until around the middle of March, and during that period lost no time by reason of any alleged injury.
“A number of plaintiff’s co-workers, on the same job, testified that when plaintiff quit the job, he told them it was for the purpose of going home and making a crop.
“4. Dr. E. E. Jordan, plaintiff’s family physician, testified in March, 1950, by deposition,. he had been plaintiff’s only family physician until recently; that on September 23, 1948 (more than 8 months after the date of the accident) he was called to plaintiff’s bedside, where plaintiff was complaining of pain in his back and right shoulder, which the doctor diagnosed as neuritis; that prior to September 23, 1948, he had met plaintiff on the street and heard plaintiff complain about his back and shoulder hurting him, but nothing was said about any injury; that he was not-told by plaintiff of any injury until August 13, 1949, or approximately 19 months after the accident (but the doctor’s subsequent testimony leaves it uncertain 'whether it was August 13, 1949 or March 2, 1949, that plaintiff first mentioned the accident), although he had treated plaintiff on September 23 and 27, 1948, February 26 and April 9, 1949.
“It should be borne in mind that Dr. Jordan was plaintiff’s physician and was called by plaintiff as a witness and plaintiff is bound by his testimony. Plaintiff, himself, admits that he saw no doctor, other than Dr. Jordan,-at least until after Dr. Jordan sent him to Dr. R. E. Corken, subsequent to March 2, 1949, and Dr. Jordan was certain that plaintiff had not told him of any injury prior to March 2, 1949.
*711 "5. Plaintiff did go to and was treated by Drs. Roy and Corken of Natchitoches, not earlier than the last part of 1948, according to plaintiff's testimony, but more likely subsequent to March 2, 1949, according to Dr. Jordan, but the .Court was not favored with the testimony of either of these doctors. These two doctors having examined and treated plaintiff at his own request and no explanation having been offered as to why they were not called on to testify in support of plaintiff’s condition, the-Court is justified in presuming that their testimony would not have been favorable to plaintiff. Walker v. Monroe, La.App., 62 So.2d 676.
“In the absence of any explanation of why the testimony of Drs. Roy and Corken was not taken, they having been the first to examine and treat plaintiff, at plaintiff’s own request pursuant to advice from his family physician, after he had told his family physician that his pains were 'caused by injuries he received in an accident more than a year before, and they.obviously being in better position to testify to the condition at that time, than those who examined him months later, it must be presumed that these two doctors, would not have supported plaintiff’s claim that his disability was the result of the accident.
“6. All of the doctors who did testify for plaintiff admitted that his condition could have resulted from causes other than those resulting from the accident.
“The testimony of the lay witnesses offered by plaintiff was equally unconvincing.
“7. For instance, the first witness, Faust * * * said plaintiff hadn’t done any work' since he got hurt, but couldn’t fix any date, except he thought it was in 1948. This witness went to see plaintiff -shortly after he was hurt, while he was in bed; up and down, but the facts show plaintiff continued to work on the same job for almost two months after the accident, and called no doctor to his home until more than eight (8) months after the accident.
“8. The testimony of Mr. Winn, the witness who counsel for plaintiff in his argument and brief, so highly recommended, was equally unsatisfactory. He was equally positive that plaintiff had done no work since the accident. He said plaintiff’s work for Pugh, the defendant, ended when plaintiff got hurt * * * when as a matter of fact, as we have pointed out, he continued to work for approximately two' months longer. As an illustration of the uncertainty of this witness’ testimony * * * ”
“ ‘Q. You don’t know when he did quit? A. I know he was hurt in January.
“ ‘Q. How do you know the date he was hurt? A. I don’t know.’
“9. Although defendant offered testimony to show that plaintiff told his coworkers that he was leaving the job to ‘make a crop’ and that a crop was made,, and plaintiff, himself, testified that his sons made the crop,, he brought no member of his family to verify that statement.” • ■
We have examined the record in' this case' with extreme care. The judge who decided the case did not try it, and the attorney who ■filed the suit did not continue the prosecution of the case to judgment. The record does not show why he withdrew from the case after filing the suit and the first amend-' ed petition, and after taking the testimony of Dr. Jordan and the testimony of Dr. Fraser.
Plaintiff only suffered a slight injury in. the accident and was not seriously injured. His version of how the accident occurred is reflected by his statement:
“ * * *■ I was at-the'big end or cut end — the end he had chopped off — holding a limb and when it broke loose, it came rapidly and naturally, the. fellows had on it and brought it faster seemed like and I turned to go and some of those small limbs' there and the weeds were about that high - (indicating) out there and they had broken down some and I got my feet in them and couldn’t-get out and that — the big end what was cut off caught me on the shoulder and knocked me . down and I was blacked out there and they said they picked it up off of me and I don’t know *712 just how long there before I was able to set up and don’t know just exactly what all was going on. * * * ”
The end of the limb striking plaintiff fell from no great height because he was pulling on the big end and tripped and fell over the small limbs and weeds when his feet became entangled, and the limb fell pn him striking his shoulde.r. ,
The medical testimony contained in the record and offered by plaintiff was based on limited physical examinations by Drs. Jordan, Byrd and Pierson, the three.expert witnesses upon whom he , relies to show a causal connection between the injuries suffered in the accident and the arthritic condition' producifig the disability. None of these physicians made a thorough clinical or laboratory examination of plaintiff, and yet they expressed an opinion that he was totally disabled without showing any basis for their conclusion. The only medical evidence contained in the record showing the nature and extent of a thorough physical examination was made by Dr. Fraser. He made a clinical, laboratory and X-ray examination of plaintiff. According to his examination, he found that plaintiff had a low grade of hypertrophic arthritis in the lumbar area and that he had a slight -elevation in blood sedimentation, which indicated to him that plaintiff had a low grade inflammatory process in the circulatory system which was the cause of the soreness and pain complained of by plaintiff. The plaintiff had suffered the loss of his teeth several years prior to the accident, and was also suffering -from inguinal hernias on both the left and right side. He is of small stature, is only five feet, six inches tall, weighs 122 pounds, and was 56 years old at t-he- time of the accident. Plaintiff made no attempt to show why he had his teeth extracted and why he was only wearing an upper plate. The medical evidence shows, and we know, that hypertrophic arthritis can be caused by infectious disease and other causes beside trauma. In view of the time intervening between the date of the alleged accident on January 16, 1948, and the -first diagnosis of arthritis from the X-rays in the early part of 1949, and the slight damage it had done to plaintiff as late as in May, 1950, when Dr. Fraser made the X-rays, which are the only X-rays contained in the record and about which any physician testified, the plaintiff has failed to show a causal connection between the accMent and injuries he suffered on January 16, 1948, and the physical condition he presented in Dr. Fraser’s examination, as -well -as.that found by Dr. Pierson, some two years later. There is- no substantial conflict in the medical testimony in this case because all of the physicians found the plaintiff suffering from an arthritic condition. ■ The only difference in their respective opinions is whether there is any connection between the arthritic condition and the accident suffered by plaintiff during the course of His employment.
To hold an employer liable for com-peiisation to an employee who suffers such diseased condition of the spirie or joints, the evidence must conclusively show that the condition was aggravated or accelerated to incapacitate the employee. The disability ought to come into existence within a reasonable time following the accident and should manifest' itself so it can be determined that it was brought about'by an accident in the employment and work the employed' was performing.
If plaintiff had suffered the injuries complained of to the extent alleged in his petition, he would not have been able to have continued his work or even been able to be on the job during the months of February and March- following the accident on January 16, 1948. The proof in this case by both medical and lay testimony is not as strong as it was in the case of Barrett v. Wilson, La.App., 152 So. 795. The Court títere said:
“Where much time intervenes between injury and discovery of arthritis, compensation claimant must negative, as far as possible, every theory of cause of disability, except theory relied on.”
The burden of proof in a compensation case on the part of the plaintiff is the same as in any other case, and he must make out his case by a preponderance of the evidence The same as in any other case. *713 Barrett v. Wilson, supra; Horton v. Louisiana Veneer Co., La.App., 196 So. 363; Gardner v. Travelers Insurance Co., La.App., 12 So.2d 830; Haddad v. Commercial Motor Truck Co., 150 La. 327, 90 So. 666; Piske v. Brooklyn Cooperage Co., 143 La. 455, 78 So. 734; Terry v. Sparco Oil Corp., La.App., 150 So. 391.
We agree with the trial judge that the plaintiff has failed to prove by convincing evidence a causal connection between the accident and the arthritic condition he now has. , .
For the reasons assigned, the judgment appealed from is affirmed.